Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 26

1           MR. FUCHS:  Objection, form.

2           If you know what that means you can

3     answer.

4      A    It's irrelevant.  I mean, that question

5     doesn't make sense.

6     BY MR. HERRINGTON:

7      Q    If you can't answer it I'll restate it.

8           Business has improved at Diamond Club and

9     the fees that the dancers are charged have

10    increased as you say, correct?

11     A    Yes.

12     Q    Have the fees that dancers are charged

13    increased because you are no longer in need of --

14    the club no longer has trouble attracting as many

15    dancers?

16          MR. FUCHS:  Objection to form.

17          If you know, you can answer.

18     A    No, I don't know.

19    BY MR. HERRINGTON:

20     Q    So you don't know why the fees have

21    increased?

22     A    No.

23     Q    You don't know?

24     A    (Shaking head.)

25     Q    Does Diamond Club keep a record of who

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 27

1    has -- which dancers have worked on a given shift?

2        A    We have a sign-in sheet.

3        Q    Does the sign-in sheet list the time, the

4    exact time that a dancer arrived?

5        A    Yes.

6        Q    And has that been the case before and

7    after the sale of the business?

8        A    Yes.

9        Q    Do you know how far back these records

10   are maintained?

11       A    No.

12       Q    Are there rules at Diamond Club about

13   dancers putting their hands or knees on the floor?

14       A    No.

15       Q    Are there dancers at Diamond Club who

16   have worked there more than one year?

17       A    Yes.

18       Q    Are there dancers at Diamond Club who

19   have worked there more than two years?

20       A    Yes.

21       Q    Can you estimate how many dancers

22   currently at Diamond Club have been there more than

23   one year?

24       A    No.

25       Q    Can you estimate how many have been there

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.              August 8, 2014

Page 28

1    more than two years?

2        A    No.

3        Q    Have more than five been there more than

4    a year?

5        A    Yes.

6        Q    In the course of a given month currently,

7    how many different dancers work at Diamond Club?

8        A    I can't answer that.

9        Q    Can you answer currently how many dancers

10   in the course of a single week typically work at

11   Diamond Club?

12       A    No.

13       Q    Would you say that more than 10 dancers

14   who have worked at Diamond Club in the past month

15   have been there more than two years?

16       A    I don't know.

17           MR. FUCHS:  I'm going to object.  He's

18   already said he can't estimate that number, so...

19           MR. HERRINGTON:  Well, I've asked for

20   minimum amounts.

21           MR. FUCHS:  Well, I understand.  He said

22   he can't estimate, so, are you going to ask him

23   about 20, 30?

24   BY MR. HERRINGTON:

25       Q    Well, you did state that more than five

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 29

 1    have worked there more than two years?

 2         A    Yes.

 3         Q    But you can't state whether it's more

 4    than 10?

 5         A    No.

 6         Q    Who makes decisions about which dancers

 7    are hired at Diamond Club?

 8         A    I do.

 9         Q    And how are those decisions made?  How do

10    you make those decisions?

11         A    I have them fill out an application.

12         Q    Is there anything else required other

13    than a paper application?

14         A    Body check.

15         Q    And what does that entail?

16         A    I just get a look at them naked.

17         Q    Do they have to dance?

18         A    No.

19         Q    Does Diamond Club have any dancers

20    starting with them in the past -- in the past three

21    years, let's say, has Diamond Club had dancers

22    start working at Diamond Club who have never danced

23    before at a club?

24         A    Yes.

25         Q    Have any new dancers come on since the

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.     August 8, 2014

Page 30

1    sale of the business who did not have previous

2    dancing experience?

3         A     Yes.

4         Q     Can you tell me approximately your best

5    estimate of how many dancers are at Diamond Club

6    now on a typical Friday night?

7         A     No.

8         Q     Can you tell me approximately how many

9    dancers were there the last Friday night that you

10   worked?

11        A     I don't work nights.

12        Q     Well, you said you worked one in January;

13   is that correct?

14        A     So you want to know about January?

15        Q     Yeah.  The last time you worked a Friday

16   night approximately how many dancers do you think

17   were there?

18        A     I can't remember.

19        Q     Would it probably be more than 10?

20        A     Probably.

21        Q     How many DJs did you say work at night

22   now?

23        A     One as far as I know, but I don't work

24   night shift.

25        Q     Do you know the name of the nightclub DJ

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 31

1    or the night DJ?

2        A    I do.

3        Q    And what is his name?

4        A    Dice.

5        Q    Do you know his legal name?

6        A    I'm sorry, I don't.

7        Q    Do you know how much the base hourly rate

8    for a waitress at Diamond Club is currently?

9        A    No, sir.

10       Q    Do you know if any waitresses are paid

11   currently 2.13 an hour or 2.15 an hour?

12       A    I don't know what they make.

13       Q    Are you certain that they are being paid

14   any wages at all?

15       A    I'm under the impression they are.

16       Q    Are you aware of what the VIP rooms at

17   Diamond Club are?

18       A    Yes.

19       Q    Are you aware that customers are required

20   to pay a fee for using a VIP room for an amount of

21   time?

22       A    Yes.

23       Q    And are you aware that dancers are

24   required to charge a minimum amount for a dance for

25   a set amount of time in a VIP room?

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.     August 8, 2014

Page 32

1       A       Yes.

2       Q       Is there a maximum amount that a dancer

3    can charge for dances in a VIP room?

4       A       No.

5       Q       Does Diamond Club keep records of dance

6    fees in VIP rooms made in cash?

7       A       I don't know.

8       Q       Does Diamond Club keep records of dance

9    fees for VIP rooms made by credit card?

10      A       I don't know.  I'm a manager, not the

11   bookkeeper.

12      Q       Are you aware of dancers receiving IOU

13   slips for monies collected in VIP rooms by credit

14   card?

15      A       Yes.

16      Q       How are those IOU slips -- how do dancers

17   cash in an IOU slip and receive cash for that?

18      A       They bring it to the club and usually

19   hand it to a bartender --

20      Q       Who do they hand --

21      A       -- or me.

22      Q       -- the IOU slip to?

23      A       To me or a bartender.

24      Q       And then if it's given to you you would

25   give it to a bartender?

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 33

1      A    No, I would take it to Ms. Carmen.

2      Q    To Carmen.

3           What about before the sale of the club?

4      A    I would take it to Karen.

5      Q    To Karen, okay.

6           And they would take the IOU slip from

7  you?

8      A    Yes.

9      Q    And they would give you an amount of

10 cash?

11     A    No.

12     Q    What would they give you?

13     A    Check.

14     Q    And the check --

15     A    Only.

16     Q    -- would be made out to whom?

17     A    The dancer.

18     Q    The dancer who gave you the IOU slip?

19     A    Precisely.

20     Q    And are these IOU slips turned in to you

21 or to Carmen or to Karen --

22     A    Yes.                           .

23     Q    -- on the same shift that they are --

24 that they perform the dance that got them the IOU

25 slip?

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 34

```
 1      A     Not usually.

 2      Q     Not usually.

 3            Do they wait a set amount of time before

 4  bringing IOU slips in?

 5            MR. FUCHS:  Object to form.

 6            If you know.

 7      A     You know, that's just a hard question to

 8  answer.  They may not work for a week.

 9  BY MR. HERRINGTON:

10      Q     But they typically would not bring the

11  IOU slip in the same night that they earned it?

12            MR. FUCHS:  Objection to form.

13      A     Typically, no.

14  BY MR. HERRINGTON:

15      Q     Are dancers required to pay the DJ a

16  certain percentage of their tips earned?

17      A     Yes.

18      Q     And what is that percentage?

19      A     10 percent.

20      Q     Is there a minimum amount per shift that

21  each dancer has to pay the DJ?

22      A     Suggested $10.

23      Q     And do dancers pay a percentage of their

24  earnings from VIP room dances to the DJ?

25      A     I imagine that's included, yes.
```

Harold Hunt, 30 (b)(6)      Thompson, et al. v. 1715 Northside Dr., et al.      August 8, 2014

Page 35

1      Q      What would happen if a dancer did not
2   give 10 percent of her tips or the cash she
3   receives from customers to the DJ?
4           MR. FUCHS:  Objection to form.
5           MR. HERRINGTON:  I can rephrase.
6   BY MR. HERRINGTON:
7      Q      Would there be any consequence for a
8   dancer not giving the DJ 10 percent of her tips or
9   monies received in VIP rooms?
10          MR. FUCHS:  Same objection.
11     A      That would be between the DJ and the
12  dancer.
13  BY MR. HERRINGTON:
14     Q      And you would not intervene if the DJ
15  complained?
16     A      If they complained -- if a DJ complained?
17     Q      Yes.
18     A      Haven't had that problem.
19     Q      I'm sorry?
20     A      Haven't had that problem.
21     Q      If a DJ told you that a dancer was not
22  giving him 10 percent of her tips, what would your
23  response be?
24          MR. FUCHS:  Objection to form.
25          MR. SCHLANGER:  Objection, calls for

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 36

 1   speculation.

 2           MR. FUCHS:  Objection to form.  I'm

 3   sorry.  I made an objection.

 4   BY MR. HERRINGTON:

 5       Q    As a manager you do have to --

 6       A    Keep the peace.

 7       Q    Do you have to react to new situations,

 8   unexpected situations?

 9       A    Say that again.

10       Q    As a manager, do you encounter unexpected

11   situations?

12       A    Yes.

13       Q    And based on your experience working in

14   the club, can you not tell us what your response

15   would be if a dancer refused to tip out a DJ?

16           MR. FUCHS:  I'm going to object.

17   Matthew, you're asking him, I think, improper

18   hypothetical questions and you're asking him to

19   speculate what his response would be under a set of

20   circumstances --

21           THE WITNESS:  Exactly.

22           MR. FUCHS:  -- that haven't existed.

23           MR. MAGNUS:  Not just that, you're asking

24   clearly a question outside the scope of the

25   30(b)(6).

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.     August 8, 2014

Page 37

```
 1            MR. HERRINGTON:  I'll talk to Anthony and
 2   we'll come back to it if we need to.
 3   BY MR. HERRINGTON:
 4       Q    Are you aware if Diamond Club issues
 5   1099s to dancers?
 6            Let me back up.
 7            Do you know what an IRS Form 1099 is?
 8       A    Yes, I do.
 9       Q    Are you aware if Diamond Club issues
10   1099s to dancers?
11       A    I'm aware that they do, yes.
12       Q    Did they do it this year?
13            MR. MAGNUS:  You talking about '13?
14            MR. HERRINGTON:  No, did they issue them
15   in 2014.
16            MR. MAGNUS:  Have they yet?
17            MR. FLETCHER:  For tax year 2014.
18            MR. HERRINGTON:  They would have issued
19   it the following year.
20       A    Yes.
21   BY MR. HERRINGTON:
22       Q    They did issue them this year.
23            And are they issued for every dancer who
24   has worked in the previous tax year?
25       A    Yes.
```

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.          August 8, 2014

Page 38

1      Q     And has that been the case for the past

2  six years?

3      A     Uh-huh.  Yes, sir.

4      Q     What earnings are included on those IRS

5  Forms 1099?

6      A     To my knowledge, it's a credit card for

7  VIP.

8      Q     Are any other tips or earnings of the

9  dancers included?

10      A     Not to my knowledge.

11      Q     Do you know why, for example, cash tips

12  are not included?

13      A     Because they're subcontractors, they're

14  responsible for their own upkeep of their earnings

15  and their taxes.

16      Q     Who accepts VIP room fees from customers?

17  Is there a set employee or person at Diamond Club

18  who accepts the room fees from customers?

19      A     A waitress.

20      Q     A waitress.  So any waitress?

21      A     Yes.

22      Q     Do dancers pay you anything per shift

23  that they work?

24      A     They pay a house fee.

25      Q     They pay a house fee.  And how much is

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.          August 8, 2014

Page 39

1   that?

2        A    Some of that money comes to me.

3        Q    You said earlier the house fee, the base

4   house fee is $10?

5        A    We talking before or now?

6        Q    Uh-huh, now.  What is the base --

7        A    Yeah.

8        Q    -- house fee now?

9        A    $10.

10       Q    And what was the base house fee last

11  year?

12       A    20.

13       Q    20, okay.

14            So the money that you receive from

15  dancers comes out of the $10 or is it in addition

16  to the $10?

17       A    No, comes out of the $10.

18       Q    And earlier last year, did it come out of

19  the $20 or was it in addition to the $20?

20       A    Comes out of the $20.

21       Q    There is not a separate manager fee on

22  top of the house fee?

23       A    Uh-uh.

24       Q    Okay.

25            MR. FLETCHER:  Is that a no.

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 40

 1    BY MR. HERRINGTON:

 2        Q    Would you say yes or no?

 3        A    No.

 4        Q    When dancers pay additional or larger

 5    house fees for arriving late to a shift, who is it

 6    that collects the difference between the base fee

 7    and the higher fee?

 8        A    I don't understand the question.

 9        Q    If a dancer arrives at noon, she pays how

10    much?

11        A    Are you asking me where the money goes?

12        Q    I'm saying, if a dancer comes later to a

13    shift and therefore pays extra, does the base

14    amount and the extra amount both go to the same

15    place?

16        A    I don't understand that question.

17        Q    Is it retained by the house, is the extra

18    amount retained by you, or by the DJ, or anyone

19    else?

20        A    By the house.

21        Q    It's all retained by the house?

22        A    (Nodding head.)

23        Q    Prior to the new ownership, when C.B.

24    Jones owned Diamond Club, what would the club's

25    response to a girl -- I'm going to have to refresh

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.     August 8, 2014

Page 41

1   my memory.  I'm going to have to ask you a couple

2   of repetitive questions.

3               When C.B. Jones owned the Diamond Club

4   prior to the new ownership, were dancers required

5   to wear garters?

6       A     Not required, suggested.

7       Q     Were they permitted to leave the club

8   with customers?

9       A     It was against my better judgment to let

10  them do that.

11      Q     And if they wanted to leave with a

12  customer what did you do?

13      A     I would strongly advise them not to do

14  it.

15      Q     And if they ignored your advice what

16  would you do?

17      A     No penalty.

18      Q     Did you ever impose penalties for

19  violation of any rules on any dancers in the past

20  three and a half years?

21      A     What do you mean by penalties?

22      Q     Did you ever impose or require dancers to

23  pay anything other than a house fee, an additional

24  house fee for coming later, a percentage of monies

25  to the DJ, that was based on improper conduct of

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 42

1   any kind?

2       MR. FUCHS:  I think he's talking about

3   fines, if I may.

4       A    There were several occasions when I had a

5   dancer left intoxicated.

6   BY MR. HERRINGTON:

7       Q    Uh-huh.

8       A    After being told not to drive, was fined.

9       Q    How much would you typically fine someone

10  for leaving intoxicated?

11      A    To drive, after I already Breathalyzed

12  them, after being told not to drive, $200 fine.

13      Q    And who would retain that money?

14      A    It would go to the house, but it usually

15  was never collected.

16      Q    Did you ever impose any other kinds of

17  fines for improper conduct?

18      A    No, sir.

19          MR. COLLINS:  Can we take a few minutes.

20          (Recess taken 1:52 - 1:55 p.m.)

21          MR. HERRINGTON:  We're back.

22  BY MR. HERRINGTON:

23      Q    Just a few more minutes and then we'll be

24  done.

25      A    Okay.

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 43

1    Q    I only have really one area left that I
2  want to talk about and that's your communications
3  and relationship with C.B. Jones, prior to the --
4  you know, prior to the new ownership from the time
5  that you started in late 2007 through December of
6  2013, any of my questions relate only to that
7  period, okay?
8    A    Very well.
9    Q    How do you know C.B. before you were
10 brought on as a manager?
11   A    I was introduced to him by another friend
12 who I done work for.  I remodeled his house.
13   Q    Had you ever done any management of a
14 nightclub or a bar before?
15   A    No.
16   Q    And from the time that you started, was
17 C.B. ever heavily involved in the day-to-day
18 operation of Diamond Club at any time?
19   A    Wasn't at the club.
20   Q    Do you know if he had been more actively
21 involved in the operation of the club day-to-day
22 shortly before you arrived?
23   A    I have no idea.
24   Q    When you were starting out as a manager
25 of Diamond Club, did you create any kinds of rules

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.          August 8, 2014

Page 44

1    or make any new policies on your own?

2          A     No.

3          Q     Who was your boss while you were working

4    at Diamond Club during C.B. Jones' ownership?

5          A     I was the boss.

6          Q     Did you have anyone directly superior to

7    you?

8          A     No.

9          Q     No one could tell you what to do

10   concerning your job?

11         A     Well, Mr. Jones could if he -- if he felt

12   the need.

13         Q     But he rarely felt the need?

14         A     Yeah, rarely felt the need.

15         Q     Okay.

16         A     If ever.

17         Q     How often did you speak to -- how often

18   did you speak to C.B. when you first started as a

19   manager?  How often were you in communication with

20   him about the club?

21         A     About the club?

22         Q     Uh-huh.

23         A     When I first started probably four times

24   a week.

25         Q     And over the years did that decrease?

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.     August 8, 2014

Page 45

1      A      Not our conversations, but about work

2   definitely decreased.

3      Q      He was less interested in the operation

4   of the club --

5      A      Yeah.

6      Q      -- as time went by?

7             Do you know why?

8      A      We were friends, he didn't want to talk

9   about work.

10     Q      Do you believe it was because as you

11  gained more experience at the club he trusted your

12  judgment more?

13     A      Absolutely.

14     Q      Have you ever had any role in doing

15  advertising for Diamond Club?

16     A      No.

17     Q      In placing orders with advertisers,

18  you've never had even a clerical role in any of

19  that?

20     A      No, no clerical role.

21     Q      Does Diamond Club do special promotional

22  nights?

23     A      I understand it does now.

24     Q      It does now?

25     A      But I'm not on night shift.

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.     August 8, 2014

Page 46

1     Q     During the time that C.B. owned the club,

2  can you give me any examples of typical promotions

3  that would be advertised?

4     A     There was no promotions.

5     Q     There were no promotions under C.B.

6  Jones?

7     A     Well, you'll have to describe what you

8  mean by promotions to me.

9     Q     Drink specials?

10    A     Not a lot.

11    Q     Special dance acts?

12    A     Didn't do it.

13    Q     Guest celebrities?

14    A     None.

15    Q     Guest DJs?

16    A     No.

17    Q     Did Mr. Jones ever call you for advice

18  about the operation of the club -- or I'm sorry,

19  did you ever call Mr. Jones for advice about

20  operation of the club?

21    A     I'm glad you rephrased that.

22    Q     Yeah.

23    A     Sure, I did.

24    Q     It's a long day.

25    A     He never asked for my advice.

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 47

1     Q    And can you give me examples of things

2  that you would call him for advice about?

3     A    Normally the only time I would call him

4  would be if a situation arised where a car was

5  broken into, brief case was stolen, maybe there was

6  an altercation in the club where a customer needed

7  some special attention.

8     Q    Okay.

9     A    Usually monetary.

10    Q    Uh-huh.

11    A    Or --

12    Q    Did you ever -- I'm sorry, I don't want

13  to interrupt you.

14    A    Go ahead.  I interrupted you.

15    Q    Did you ever contact Mr. Jones about

16  problems with any employees or dancers?

17    A    If I did it was a rare occasion.

18    Q    You were left to --

19    A    Yes.

20    Q    -- make decisions about how to deal with

21  employees?

22    A    Uh-huh.

23    Q    Okay.

24          MR. MAGNUS:  Say yes.

25    A    Yes, sir.

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.        August 8, 2014

Page 48

1           MR. HERRINGTON:  I think that's it.

2           MR. FUCHS:  Very good.

3           We'll reserve signature, please.

4           Thanks you, folks.

5           MR. HERRINGTON:  Thank you.

6           THE COURT REPORTER:  Did you need copies

7    of the depositions?

8           MR. FUCHS:  Yes.  Yes.  I usually just

9    get e-trans.  That's all I need.

10          MR. COLLINS:  Same for us.

11          (Deposition concluded at 2:01 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.     August 8, 2014

Page 49

1                C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6              I hereby certify that the

7         foregoing transcript was taken down, as

8         stated in the caption, and the questions

9         and answers thereto were reduced to

10        typewriting under my direction; that the

11        foregoing Pages 1 through 48 represent a

12        true and correct transcript of the

13        evidence given upon said hearing, and I

14        further certify that I am not of kin or

15        counsel to the parties in the case; am not

16        in the regular employ of counsel for any

17        of said parties; nor am I in anywise

18        interested in the result of said case.

19        The witness did reserve the right

20        to read and sign the transcript.

21              This, the 18th day of August, 2014.

22

23        _____

24        Judith L. Leitz Moran, CCR-B-2312
          Certified Court Reporter

25

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 50

1                    DISCLOSURE OF REPORTER

2

3          Pursuant to Article 10.B of the Rules and
Regulations of the Board of Court Reporting of the
4    Judicial Council of Georgia, I make the following
disclosure:

5

           I am a Georgia Certified Court Reporter.  I am
6    here as a representative of Regency-Brentano, Inc.

7          I am not disqualified for a relationship of
interest under the provisions of O.C.G.A.
8    9-11-28(c).

9          I was contacted by the office of
Regency-Brentano, Inc., to provide court reporting
10   services for this deposition.

11         I will not be taking this deposition under any
contract that is prohibited by O.C.G.A. Section
12   15-14-37(a) and (b).

13         I have no exclusive contract to provide
reporting services with any party to the case, any
14   counsel in the case, or any reporter or reporting
agency from whom a referral might have been made to
15   cover this deposition.

16         I will charge my usual and customary rates to
all parties in the case, and a financial discount
17   will not be given to any party to this litigation.

18         This, the 18th day of August, 2014

19

20

21         _____
           Judith L. Leitz Moran, CCR-B-2312
22         Certified Court Reporter

23

24

25

Harold Hunt, 30 (b)(6)    Thompson, et al. v. 1715 Northside Dr., et al.    August 8, 2014

Page 51

1                    DISCLOSURE OF FIRM

2

3        I, Regency-Brentano, Inc., do hereby disclose
pursuant to Article 10.B. of the Rules and
4  Regulations of the Board of Court Reporting of the
Judicial Council of Georgia that Regency-Brentano,
5  Inc., was contacted by Smith Collins LLC to provide
court reporting services for this deposition and
6  there is no contract that is prohibited by O.C.G.A.
15-14-37(a) and (b) or Article 7.C. of the Rules
7  and Regulations of the Board for the taking of this
deposition.

8

9        There is no contract to provide reporting
services between Regency-Brentano, Inc., or any
person with whom Regency-Brentano, Inc., has a
10  principal and agency relationship nor any attorney
at law in this action, party to this action, party
11  having a financial interest in this action, or
agent for an attorney at law in this action, party
12  to this action, or party having a financial
interest in this action.  Any and all financial
13  arrangements beyond our usual and customary rates
have been disclosed and offered to all parties.

14

15        This 18th day of August, 2014.

16

17

18

19        _____

          FIRM REPRESENTATIVE
20        REGENCY-BRENTANO, INC.

21

22

23

24

25

Harold Hunt, 30 (b)(6)     Thompson, et al. v. 1715 Northside Dr., et al.     August 8, 2014

Page 52

1                    ERRATA PAGE

2            Pursuant to Rule 30(e) of the Federal
   Rules of Civil Procedure and/or Georgia Code
3  Annotated 9-11-30(e), any changes in form or
   substance which you desire to make to your
4  deposition testimony shall be entered upon the
   deposition with a statement of the reasons given
5  for making them.  To assist you in making any such
   corrections, please use the form below.  If
6  supplemental or additional pages are necessary,
   please finish same and attach them to this errata
7  sheet.

8            I, the undersigned, HAROLD L. HUNT,
   hereby certify that I have read or have had read to
9  me the foregoing, and that to the best of my
   knowledge said is true and accurate with the
10 exception of the following corrections.

11

12 Page/Line/    Change    /    Reason

13 _____/_____/_____/_____

14 _____/_____/_____/_____

15 _____/_____/_____/_____

16 _____/_____/_____/_____

17 _____/_____/_____/_____

18 _____/_____/_____/_____

19 _____/_____/_____/_____

20 _____/_____/_____/_____

21 _____/_____/_____/_____

22 _____/_____/_____/_____

23 _____/_____/_____/_____

24 _____/_____/_____/_____

25 _____/_____/_____/_____

Harold Hunt, 30 (b)(6)      Thompson, et al. v. 1715 Northside Dr., et al.      August 8, 2014

Page 53

```
1   Page/Line/     Change    /    Reason
2   ____/____/_____/_____
3   ____/____/_____/_____
4   ____/____/_____/_____
5   ____/____/_____/_____
6   ____/____/_____/_____
7   ____/____/_____/_____
8   ____/____/_____/_____
9   ____/____/_____/_____
10  ____/____/_____/_____
11  ____/____/_____/_____
12  ____/____/_____/_____
13  ____/____/_____/_____
14  ____/____/_____/_____
15  ____/____/_____/_____
16
17
18                      _____
                             HAROLD L. HUNT
19
20  Sworn to and subscribed before me
    this _____ day of _____, 20__.
21
22  _____
    Notary Public.
23  My Commission Expires _____.
24
25
```