IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **DELBRA L. DEAN**, | |
| Plaintiff, | |
| vs. | Civil Action No. 1:14-cv-3775-CAP |
| **1715 NORTHSIDE DRIVE, INC. et al.,** | |
| Defendants. | |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

### I.  SUMMARY OF MATERIAL FACTS

Defendants are the current and former owners of Dreams,[1] formerly known as Diamond Club (hereinafter "the Club"),[2] an Atlanta gentlemen's club.[3] The Club features adult entertainment and serves alcohol and food.[4] The Club treats its dancers as independent contractors[5] and does not pay them any wages.[6]

---

[1] Plaintiff's Statement of Material Facts to Which There is No Genuine Issue to Be Tried (hereinafter "P's SMF"), ¶¶ 3–9, 13–15.
[2] P's SMF, ¶ 16.
[3] P's SMF, ¶ 18.
[4] P's SMF, ¶ 18.
[5] P's SMF, ¶¶ 35, 36, 105.
[6] P's SMF, ¶ 48, 105.

Defendant 1715 Northside Drive, Inc. (hereinafter "1715") has operated the Club since the late 1990's.[7] Earlier in the 1990's, the Club was at another address, and was operated by 1400 Northside Drive, Inc.,[8] which was also owned by Defendant Jones.[9] In 1993, the U.S. Department of Labor Wage & Hour Division audited 1400 Northside Drive, Inc. (and numerous other Atlanta gentlemen's clubs) and determined that its dancers were employees, rather than independent contractors.[10] As part of a settlement with Wage & Hour, 1400 agreed to pay its dancers in accordance with the FLSA's requirements for employees.[11]

1715 was wholly owned by Defendant C.B. Jones until early December 2013.[12] In December 2013, Jones sold 1715 to Defendant A-1 Entertainment, LLC (hereinafter "A-1"),[13] whose director and sole member is Defendant Carmen Popovitch.[14] The $1.1 million purchase was financed entirely by *personal* loans to Popovitch.[15] Since the purchase, 1715 and A-1 have operated as a single enterprise,

---

[7] P's SMF, ¶¶ 3–5.
[8] P's SMF, ¶¶ 1–2.
[9] P's SMF, ¶ 3.
[10] P's SMF, ¶¶ 106–107.
[11] P's SMF, ¶¶ 108–109.
[12] P's SMF, ¶ 6.
[13] P's SMF, ¶ 7.
[14] P's SMF, ¶ 14–15.
[15] P's SMF, ¶ 9–10.

with the two companies' bank accounts have been interchangeably for payroll.[16] A-1 has no business venutres other than ownership of 1715.[17]

In 2010, 2011, 2012, 2013, and 2014 the Club had gross revenues in excess of $500,000 per year.[18] At all times during those same years, the Club had two or more full-time employees (specifically waitresses and bartenders) regularly handling alcoholic beverages that they served to customers.[19] The Club's liquors sales—which is a major part of the club's business[20]—include sales of a variety of international vodkas, gins, whiskeys, and tequilas that have been shipped in interstate commerce.[21]

After the acquisition of 1715 by A-1 in December 2013, the Club never sought any opinion or legal advice as to its wage obligations to the Club's dancers.[22] Popovitch claims she merely read DOJ fact sheets and independently made the determination that Plaintiff and other dancers were independent contractors and that she "should not compensate them in any way."[23]

---

[16] P's SMF, ¶ 97–99.
[17] P's SMF, ¶ 96.
[18] P's SMF, ¶¶ 19–23.
[19] P's SMF, ¶ 24.
[20] P's SMF, ¶ 25.
[21] P's SMF, ¶¶ 26–31.
[22] P's SMF, ¶¶ 103–104.
[23] P's SMF, ¶ 105.

Each shift, dancers pay fees directly to the Club as "stage rental fees."[24] The dancers must pay them whether or not they want to use the stage,[25] and the stage rental fees increase upon the time of arrival. Dancers are not strictly required to perform on stage for the third song, and a dancer may choose not to do so between approximately once a day and once a week.[26]

Dancers also pay fees to the Club's managers,[27] security personnel,[28] and DJs.[29] The Club's managers even collected fees each shift from waitresses and bartenders, who were tipped employees.[30]

The DJ's job duties are: "To play the music throughout the course of the day," and "To at times maintain the girls movement to and from stage."[31] The DJ announces the next dancer to perform on stage during the second song of the preceding dancer's three-song set.[32] The rotation schedule is set by the order the dancers arrive at the Club.[33] Dancers could request specific songs from the DJ

---

[24] P's SMF, ¶ 75.
[25] P's SMF, ¶ 69.
[26] P's SMF, ¶ 68.
[27] P's SMF, ¶ 76.
[28] P's SMF, ¶ 52.
[29] P's SMF, ¶ 64.
[30] P's SMF, ¶ 71.
[31] P's SMF, ¶ 65.
[32] P's SMF, ¶ 66.
[33] P's SMF, ¶ 67.

while on stage, but when in VIP rooms they danced to "[w]hatever played."[34] The Club also permitted a waitress to dance in VIP rooms on occasion as long as she paid the applicable fees.[35]

Dancers are hired on the basis of their appearance alone;[36] no formal training, experience, or dancing skill is required.[37] Dancers dance on stage, at customers' tables, and in VIP rooms.[38] The Club sets the minimum amounts that dancers can charge for VIP dances.[39] Popovitch also set a maximum amount that dancers could charge for an entire hour in the VIP rooms.[40] The Club receives a fee directly from customers for use of VIP rooms,[41] and dancers receive their club-mandated minimum fee.[42] The Club does not track cash paid to dancers for stage, tableside, or VIP dances.[43] However, when dancers are paid by credit card for VIP dances, the club does use a system of IOU slips,[44] and later writes checks to the dancers.[45]

---

[34] P's SMF, ¶ 70.
[35] P's SMF, ¶ 72.
[36] P's SMF, ¶ 92.
[37] P's SMF, ¶ 94.
[38] P's SMF, ¶¶ 53, 55.
[39] P's SMF, ¶ 63.
[40] P's SMF, ¶ 63.
[41] P's SMF, ¶¶ 63.
[42] P's SMF, ¶¶ 63.
[43] P's SMF, ¶ 53–54.
[44] P's SMF, ¶ 55.
[45] P's SMF, ¶ 56.

The Club deducts a 5–10% credit card fee when it writes those checks.[46] The credit card fee ostensibly compensates the Club for its monthly merchant service provider fees, which are based on the number of transactions per month.[47] The Club does not keep records of how much it pays in merchant service provider fees each month, and has no records of fees paid prior to December 2013.[48] The 10% fee imposed on dancers since December 2013 is entirely arbitrary, chosen by Popovitch just because "[t]hat is what I decided that I want to – those dancers to be charged."[49]

   Since December 2013, Popovitch has been a regular presence at the Club,[50] working in its offices contracting with vendors,[51] and writing checks to the Club's dancers.[52] She installed security cameras in the Club and watched them from her office.[53] When Popovitch observed that a DJ was romantically involved with a dancer and had manager Hunt intervene.[54]

---

[46] P's SMF, ¶ 57.
[47] P's SMF, ¶ 59.
[48] P's SMF, ¶¶ 60, 62.
[49] P's SMF, ¶ 61.
[50] P's SMF, ¶¶ 42, 46.
[51] P's SMF, ¶¶ 45, 46.
[52] P's SMF, ¶ 47.
[53] P's SMF, ¶ 82.
[54] P's SMF, ¶ 80.

While Defendants maintain that there were no rules applicable to dancers, 1715 previously testified that a list of rules was posted in the dancers' dressing room until A-1 acquired 1715 in December 2013.[55] Popovitch has also previously admitted under oath in open court that she terminated a dancer because, *inter alia*, the dancer did not appear on stage when called by the DJ, she habitually left earlier than other dancers, she did not work enough shifts each week, she drank more than the other dancers, and she sat at the bar rather than trying to entertain new customers.[56] Popovitch has admitted that dancer interaction with new customers was "important because we want the new customers to feel welcome and to be treated friendly so they can come back and, you know, spend more money."[57] Failure to come to the Club often enough was "[o]ne of the main reasons" the dancer was not permitted to renew her permit (i.e., terminated).[58]

Plaintiff's work at the Club spanned approximately four years.[59] Moreover, apart from a few scattered shifts, Plaintiff did not work at any other clubs during

---

[55] P's SMF, ¶ 81.
[56] P's SMF, ¶ 84.
[57] P's SMF, ¶ 84.
[58] P's SMF, ¶ 85.
[59] P's SMF, ¶ 110.

the course of her employment at the Club aside from "a couple of days" at one other club in 2014.[60]

The Club provides dancers with a building to perform in, a stage to perform on, a pole for pole dancing, furniture for customers to sit on, a sound system, and lighting.[61] The Club pays annual rent of approximately $215,000.[62] Plaintiff's estimates of her monthly expenditures on costumes, shoes, accessories, makeup, and hairstyling while working at the Club range from $4,350 per year to $650 per month.[63] Plaintiff now works as a "shooter girl" (essentially a cocktail waitress), and still spends the same amount on those items as she did when she worked as a dancer.[64]

## II. ARGUMENT

### A. Summary Judgment Standard

A motion for summary judgment is properly granted where the pleadings, depositions, affidavits, admissions and other materials in the record show that there is no genuine issue of material fact and that the movant is entitled to judgment as a

---

[60] P's SMF, ¶ 111.
[61] P's SMF, ¶ 88.
[62] P's SMF, ¶ 95.
[63] P's SMF, ¶ 89.
[64] P's SMF, ¶ 90.

matter of law.[65] The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.[66] Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.[67]

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record."[68] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment is proper.[69]

### B.    Enterprise Coverage

In ordered to fall under the protection of the FLSA's minimum wage and overtime protections, an employee must fall under the protections of the Act or be "covered."[70] "There are two possible types of FLSA coverage," individual and

---

[65] Fed. R. Civ. Proc. 56(c).

[66] *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999).

[67] *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

[68] *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n. 8, 127 S. Ct. 1769, 1776 (2007)).

[69] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

[70] *Josendis v. Wall to Wall Residence Repairs Inc.*, 662 F.3d 1292, 1298 (11th Cir. 2011).

enterprise.[71] An employee is subject to enterprise coverage if he is "employed in an enterprise engaged in commerce or in the production of goods for commerce."[72] An enterprise is engaged in commerce or in the production of goods for commerce if it:

> (i)   has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
>
> (ii)  is an enterprise whose annual gross volume of sales made or business done is not less than $500,000.[73]

In the present case, there can be no dispute that 1715 has employees handling and selling goods or materials that have been moved in or produced for commerce. Similar businesses are regularly held to be covered enterprises.[74] Throughout Plaintiff's employment, 1715 was in the business of selling liquor and food, and had multiple employees handling that liquor and food.[75]

---

[71] *Id.* (citing *Ares v. Manuel Diaz Farms, Inc.*, 318 F.3d 1054, 1056 (11th Cir. 2003)).

[72] 29 U.S.C. § 206(a).

[73] 29 U.S.C. § 203(s)(1)(A)(i)–(ii) (emphasis added).

[74] *See, e.g., Reich v. Priba Corp.*, 890 F Supp. 586 (N.D. Tex. 1995) (companies operating a strip club were engaged in commerce because they sold alcoholic beverages that had moved in interstate commerce and because their annual gross revenues were not less than $500,000) (citing *Donovan v. Grim Hotel Company*, 747 F.2d 966, 969–71 (5th Cir. 1984)).

[75] P's SMF, ¶¶ 18, 24.

As to the $500,000 revenue requirement, Defendant Jones has admitted that 1715 had revenues in excess of $500,000 per year during 2010, 2011, 2012, and 2013.[76] 1715 and A-1 admit they had revenues in excess of $500,000 per year during 2014.[77]

Thus, for the years 2010-2014, the entities have admitted coverage under the FLSA because they had two or more employees who handled goods that moved in commerce in a business that's revenue exceeded $500,000 per year.

## C.   1715 and A-1 are a single enterprise and, therefore, share liability for all FLSA violations after December 2013

As stated above, Dean worked for 1715 from 2010 through 2014. In December of 2013, A-1 purchased 1715. The A-1 purchase of 1715 was an acquisition of the entire company though a stock purchase—not an assets-only acquisition.[78] Thus, 1715 remained an ongoing corporate entity. Its liability for previous FLSA violations did not change after its sale to A-1.

Since A-1 acquired 1715, the two companies have functioned as an "enterprise" within the meaning of the FLSA. The FLSA defines the term "enterprise" as

> the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities

---

[76] P's SMF, ¶ 19–22.
[77] P's SMF, ¶ 23.
[78] P's SMF, ¶ 8.

> whether performed in one or more establishments or by one or
> more corporate or other organizational units . . . .[79]

In *Reich v. Priba Corp.*, the Fifth Circuit considered two companies that jointly operate a gentlemen's club and determined that they constituted a single enterprise within the meaning of the FLSA.[80] It based this conclusion on the facts that the two companies performed related activities (holding the club's liquor license and holding the club's adult entertainment license, respectively), had common control (the same corporate officers), and for a common business purpose (i.e., adult entertainment), held themselves out to public under a common name (the club name), and shared office space.[81] In a nearly identical case, *Donovan v. Executive Towers, Inc.*, the Fourth Circuit reached the same conclusion.[82]

The present case is not distinguishable from *Priba* or *Executive Towers*, except that the common control and joint operation is *even clearer* here. 1715 and A-1 are the same thing: they're both completely controlled by Carmen Popovitch—who is

---

[79] 29 U.S.C. § 203(r)(1).
[80] 890 F Supp. 586 (N.D. Tex. 1995).
[81] *Id.*
[82] 791 F.2d 925 (4th Cir. 1986) (two companies were a single enterprise where one operated a strip club and the other operated an adult bookstore, because they had a common business purpose, one person was majority shareholder in both companies, both were located on the same block, both used certain employees interchangeably, and both employed single record keeper.).

the sole member of A-1[83]—which no business function other than owning 1715.[84] The Club has paid its employees on both 1715 and A-1 checks.[85] Most astonishingly, Popovitch, as 30(b)(6) designee for 1715, could not even identify which company the Dean had an independent contractor agreement with.[86] It is thus clear that 1715 and A-1 share any liability under the FLSA because they are a single enterprise. Therefore, A1 is liable for all activities of 1715 regardless of whether they occurred before December 2013 or not.

### D.    Plaintiff was an "employee," rather than an independent contractor

The primary issue in this case is whether Dean was an employee or an independent contractor. This is not the first time a court has been asked to determine "whether exotic dancers at a strip club . . . are employees under the FLSA. Nearly without exception . . . courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage."[87]

---

[83] P's SMF, ¶ 15.

[84] P's SMF, ¶ 96.

[85] P's SMF, ¶ 98, 99.

[86] P's SMF, ¶ 38.

[87] *Hart v. Rick's Cabaret Int'l, Inc*., 967 F. Supp. 2d 901, 912–913 (S.D.N.Y. 2013) (quotation omitted) (citing *Harrell v. Diamond A. Entm't, Inc.*, 992 F. Supp. 1343, 1348 (M.D. Fla. 1997); *Reich v. Circle C. Invest*., Inc., 998 F.2d 324, 329 (5th Cir. 1993); *Thornton v. Crazy Horse, Inc.*, No. 3:06-CV-00251-TMB, 2012 U.S. Dist. LEXIS 82770, 2012 WL 2175753 (D. Alaska June 14, 2012); *Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp. 2d 1326, 1343 (N.D. Ga. 2011); *Thompson v. Linda and A. Inc.*, 779 F. Supp. 2d 139, 151 (D.D.C. 2011); *Morse v. Mer Corp*.,

Only twice before have courts found exotic dancers to be independent contractors, and in both cases, the enumerated facts and discussions of law are so meager as to render them essentially useless for guidance.[88]

The FLSA defines an "employee" as "any individual employed by an employer," "employ" is defined expansively to mean "suffer or permit to work."[89] The "suffer or permit to work" standard has been noted for its "striking breadth,"[90] and the U.S. Department of Labor has observed that it was "specifically designed to ensure as broad of a scope of statutory coverage as possible."[91] In fact, "[a] broader or more comprehensive coverage of employees . . . would be difficult to frame."[92]

The fundamental difference between an employee and an independent contractor is that as a matter of "economic reality," an independent contractor is

---

2010 U.S. Dist. LEXIS 55636, 2010 WL 2346334, at *6 (S.D. Ind. 2010); *Reich v. Priba Corp.*, 890 F. Supp. 586, 594 (N.D. Tex. 1995); *Martin v. Priba Corp.*, 1992 U.S. Dist. LEXIS 20143, 1992 WL 486911, at *5 (N.D. Tex. 1992)).

[88] *See Matson v. 7455, Inc.*, No. CV 98-788-HA, 2000 U.S. Dist. LEXIS 23013, 2000 WL 1132110 (D. Or. Jan. 14, 2000) and *Hilborn v. Prime Time Club, Inc.*, No. 4:11CV00197 BSM, ECF Doc. 89, 2012 U.S. Dist. LEXIS 188881 (E.D. Ark. July 12, 2012).

[89] 29 U. S. C. §§ 203(e), (g); *see Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S. Ct. 1344, 1350 (1992).

[90] *Id.* (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728, 67 S. Ct. 1473 (1947)).

[91] DOL Interpretive Bulletin No. 2015-1 (July 15, 2015).

[92] *U.S. v. Rosenwasser*, 323 U.S. 360, 362, 65 S. Ct. 295 (1945).

"in business for himself," while an employee is "dependent upon finding employment in the business of others."[93] The so-called "economic realities test" consists of a number of factors:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship;
>
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.[94]

### 1. Defendants Exercised Significant Control over Dean

It is undisputed that the Plaintiff and other dancers were subjected to "stage rental fees" that increased with each hour they delayed arriving at the Club, which served as a penalty for arriving late, especially because it had no relationship to the

---

[93] *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013) (citing *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301–02 (5th Cir. 1975)); *see also Freund v. Hi-Tech Satellite, Inc.*, 185 Fed. App'x 782 (11th Cir. 2006) (citing *Rutherford*, 331 U.S. at 728).
[94] *Id.* at 783 (citing *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987)).

actual use of the Club's stages.[95] The Club contends that it merely "encouraged" that dancers work at least three days per week,[96] but Popovitch admitted in an evidentiary hearing before Judge Story, that she terminated a dancer for missing stage rotations, not working enough shifts per week, leaving her shifts early, drinking more than other dancers, not appearing on stage when called, habitually leaving earlier than other dancers, not working enough shifts, and sitting at the bar rather than trying to entertain new customers."[97] The Club controlled the minimum amounts that Dancers could charge for their dances both at customers' tables and in the Club's VIP rooms.[98] Popovitch also established a maximum amount that dancers could charge for a full hour in the VIP rooms, just because she didn't feel it would be fair for the dancers to charge more.[99]

The Club required dancers to go on stage for rotations when called by the DJ.[100] While the Club did not exercise significant control over the dancers' on-stage performances, as described above, Popovitch has admitted to significant other controls.

---

[95] P's SMF, ¶ 69.
[96] P's SMF, ¶ 78.
[97] P's SMF, ¶¶ 84, 85.
[98] P's SMF, ¶ 63.
[99] P's SMF, ¶ 63.
[100] P's SMF, ¶ 66–68.

Thus, Popovitch's own testimony shows that the Club exerted extensive controls over Plaintiff and other dancers, and that the consequence of not following the rules was termination. Accordingly, this factor weighs heavily in finding that an employment relationship existed.

### 2.  *Dean Had Little Opportunity for Profit and Loss*

### 3.  *Dean's Relative Investment in Her Work Was Minimal*

As this Court remarked in *Clincy v. Galardi South Enters.*, "[t]he Court is not aware of any decision in which a court found that an exotic dancer has significant control over her opportunity for profit or loss relative to the club at which she works. Several courts, however, have rejected this argument."[101] The same is true for any arguments that gentlemen's clubs do not invest in the work of dancers beyond stages and poles.[102]

As in *Harrell*, Dean "risk[ed] little more than a daily 'tip out' fee, the cost of her costumes, and her time . . . . ultimately, it is the club that takes the risks and

---

[101] 808 F. Supp. 2d 1326, 1345-1346, 2011 U.S. Dist. LEXIS 100440, *52-55, 18 Wage & Hour Cas. 2d (BNA) 245 (N.D. Ga. 2011) (citing *Circle C*, 998 F.2d at 328; *Morse*, 2010 U.S. Dist. LEXIS 55636, 2010 WL 2346334, at *4; *Priba Corp.*, 890 F. Supp. at 593).

[102] *Id.* at 1346 (citing *Circle C*, 998 F.2d at 324; *Morse*, 2010 U.S. Dist. LEXIS 55636, 2010 WL 2346334, at *5; *Harrell*, 992 F. Supp. at 1350; and *Priba Corp.*, 890 F. Supp. at 593).

reaps the returns."[103] The Club's risk for loss is evidenced most clearly by the $1.1 million purchase price paid by A-1 to acquire 1715. It is also shown by the approximate $215,000 the Club pays in rent annually.[104] While Dean's expenditures on her costumes, hair, and makeup may have been substantial to her as an individual,[105] they pale in comparison to the investments made by Defendants. And it is also significant that Dean continues to make such expenditures on hair and makeup now that she is employed as a "shooter girl" rather than a dancer.[106]

As in the seminal *Rutherford* case, Dean's opportunity for profit was largely limited to her ability to perform more work (i.e., dances), which is analogous to a piece-rate worker's ability to produce more pieces. "As the Supreme Court has explained, a job whose profits are based on efficiency is 'more like piecework than an enterprise that actually depends for success upon the initiative, judgment or foresight of the typical independent contractor.' "[107]

---

[103] 992 F. Supp. at 1352.

[104] P's SMF, ¶ 95.

[105] P's SMF, ¶ 89.

[106] P's SMF, ¶ 90.

[107] *Scantland v. Jeffry Knight, Inc*., 721 F.3d 1308 (11th Cir. 2013) (quoting *Rutherford Food*, 331 U.S. at 730, 67 S. Ct. at 1477).

The evidence thus shows that Dean had little opportunity for profit or loss beyond that of a typical employee, and that her investment in the operation of the Club relative to Defendants was minimal. Accordingly, both of these factors weigh in favor of finding that an employment relationship existed.

### 4. Dean's Job Did Not Require Any Special Skill or Education

There is no evidence Dean has any special skill or education related to dancing. Neither Dean nor any other dancer at the Club was required to have any dancing skill; in fact, the Club hired dancers based solely on their appearance.[108] In *Clincy*, Club Onyx hired dancers by performing a "body check" and requiring the applicants to dance "to two or three songs."[109] Nonetheless, the *Clincy* court concluded that "special skills are not required to perform as an entertainer at Onyx."[110] No other conclusion can be reached in this case, where the Club did not even ask the dancers to dance prior to hiring them. This factor thus weighs heavily in favor of finding an employer–employee relations.

---

[108] P's SMF, ¶ 92.
[109] 808 F. Supp. 2d at 1330.
[110] *Id.* at 1348.

### 5. *Dean's Position Was Longstanding: Permanency and Duration of Working Relationship*

Plaintiff's work at the Club spanned approximately four years.[111] Moreover, apart from a couple of shifts, Plaintiff did not work at any other clubs during the course of her employment at the Club.[112] While "[o]ther courts have found that exotic dancers tend to be itinerant,"[113] the same cannot be said of Dean. This factor weighs heavily in favor of finding an employment relationship.

### 6. *Providing Dancers for Entertainment is Defendant's Business: Integration of Work into Alleged Employer's Business*

The final factor of the economic realities test asks whether the plaintiff's work constitutes an "essential part" of the alleged employer's business.[114] "[W]orkers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer."[115]

---

[111] P's SMF, ¶ 110.
[112] P's SMF, ¶ 111.
[113] *Clincy*, 808 F. Supp. 2d at 1348 (quoting *Harrell*, 992 F. Supp. at 1352).
[114] *Donovan v. Dialamerica Marketing, Inc.*, 757 F.2d 1376, 1385 (3d Cir. 1985) (citations omitted).
[115] *Id.*

Just as a cake decorator's work "is obviously integral" to the business of selling cakes,[116] and just as "picking the pickles is a necessary and integral part of the pickle business,"[117] so too is "stripping" integral to the business of a "strip club."

In this case, the Club's primary business is providing adult entertainment to its customers. Thus, just as in *Clincy*, any argument that nude dancing is not integral to the business of the Club would be "absurd."[118] This factor weighs very heavily in favor of finding an employer–employee relationship between Dean and the Club.

Because the factors of the "economic realities" test weigh so decisively in favor of finding that Dean was an employee of the Club, no reasonable jury could find that she was an independent contractor, and summary judgment is warranted as to that issue.

## E.    Popovitch was Plaintiff's "employer" under the FLSA

The FLSA defines "employer" expansively to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."[119] "The overwhelming weight of authority is that a corporate officer with operational

---

[116] *Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989).

[117] *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537–38 (7th Cir. 1987).

[118] *Clincy*, 808 F. Supp. 2d at 1349.

[119] 29 U.S.C. § 203(d); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S. Ct. 1344 (1992).

control of a corporation's covered enterprise is an employer along with the
corporation, jointly and severally liable under the FLSA for unpaid wages."[120]

Courts must examine the "economic reality" of the relationship between the
parties to determine if an individual is an employer within the meaning of the
FLSA.[121] The economic reality test examine whether "the alleged employer (1) had
the power to hire and fire the employees, (2) supervised and controlled employee
work schedules or conditions of employment, (3) determined the rate and method
of payment, and (4) maintained employment records."[122]

In *Dole v. Elliott Travel & Tours, Inc*., the Sixth Circuit concluded that an
individual defendant was an employer within the meaning of the FLSA and was
thus jointly and severally liable for the company's FLSA violations where he was
the chief corporate officer, had a significant ownership interest in the corporation,
and had control over significant aspects of the corporation's day-to-day
functions.[123] Where corporate officers have such control over a business' day-to-

---

[120] *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*., 515 F.3d 1150 (11th Cir.
2008) (quoting *Patel v. Wargo*, 803 F.2d 632, 63738 (11th Cir. 1986)).
[121] *Goldberg v. Whitaker House Co-op., Inc*., 366 U.S. 28, 33, 81 S. Ct. 933, 936-
37 (1961).
[122] *Villarreal v. Woodman*, 113 F.3d 202 (11th Cir. 1997) (citing *Bonnette v.
California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir.1983)).
[123] 942 F.2d 962, 965 (6th Cir. 1991); *see also Agnew*, 712 F.2d at 1514.

day operations and over the terms of an individual's employer, they are invariably held to be individually liable as employers.[124]

The facts of this case show that Popovitch not only has complete control over both 1715 and A-1, but also that she has been actively involved in the day-to-day operation of the Club since December 2013, and that she controlled the material terms of Plaintiff's employment. Popovitch purchased the Club with money obtained by personal loans,[125] she is present in the club on a regular basis,[126] she handles bookkeeping and purchasing,[127] she wrote checks to dancers,[128] and on at least one occasion she has instructed management to terminate a dancer.[129]

As sole member of A-1 and director of 1715,[130] Popovitch is the only person who can profit from its operation. Here, just as in *Dole* and *Grim Hotel*, here Popovitch was the "top [wo]man,"[131] and the Club "operated for h[er] profit."[132]

---

[124] *See, e.g., Rodilla v. TRC-RB, LLC*, 2009 U.S. Dist. LEXIS 104157 (S.D. Fla. 2009); *Exime v. E.W. Ventures, Inc*., 591 F. Supp. 2d 1364, 1374-5 (S.D. Fla. 2008); *Brauchle v. Southern Sports Grill, Inc*., 2008 U.S. Dist. LEXIS 77011 (S.D. Fla. 2008).
[125] P's SMF, ¶ 10.
[126] P's SMF, ¶ 42.
[127] P's SMF, ¶¶ 45, 46.
[128] P's SMF, ¶ 100.
[129] P's SMF, ¶ 84.
[130] P's SMF, ¶ 14–15.
[131] *Agnew*, 712 F.2d at 1514; *Grim Hotel*, 747 F.2d at 972.
[132] *Id.*

Based on these undisputed facts, it is clear that Popovitch is jointly and severally liable with 1715 and A-1 for any FLSA violations.

### F.   Defendants cannot meet their burden of showing that Plaintiff was an exempt creative professional

The FLSA states that the minimum wage requirement "shall not apply with respect to . . . any employee employed in a bona fide . . . professional capacity . . . as such term[] [is] defined and delimited from time to time by regulations of the Secretary."[133] Defendants have claimed that Dean was such a creative professional.[134] The applicable regulations define exempt "creative" professionals as those professionals "[w]hose primary duty is the performance of work . . . *[r]equiring* invention, imagination, originality or talent in a recognized field of artistic or creative endeavor."[135]

The professional exemption is an affirmative defense, and the employer bears the burden of proving it.[136] The Eleventh Circuit has recognized the "Supreme Court's admonition that courts closely circumscribe the FLSA's exceptions."[137]

---

[133] 29 U.S.C. § 213(b).

[134] Dkt. 21 (Answer to Amended Complaint), pg. 11.

[135] 29 CFR 541.302(a) (emphasis added).

[136] *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1269 (11th Cir. 2008) (citing *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008); *Brock v. Norman's Country Market, Inc.*, 835 F.2d 823, 826 (11th Cir. 1988).

[137] *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997).

And exemptions are to be construed narrowly and "applied only to those clearly and unmistakably within the terms and spirit of the exemption."[138] The creative professional exemption "does not apply to work which can be produced by a person with general manual or intellectual ability and training."[139]

In this case, the undisputed evidence shows that:

(1)    the Club hired dancers on the basis of appearance alone and did not require dancers to actually dance before being hired;[140]

(2)    the Club hired dancers with no previous dancing experience;[141]

(3)    Plaintiff's only education is high school and a non-degree medical assisting program;[142]

(4)    the Club permitted a waitress to dance in VIP rooms on occasion as long as she paid the applicable fees;[143]

(5)    Plaintiff could request specific songs from the DJ while on stage, but when in VIP rooms she danced to "[w]hatever played."[144]

---

[138] *Brock*, 835 F.2d at 826.

[139] *Henderson v. 1400 Northside Drive, Inc.*, Order Granting Partial Summary Judgment, 2015 U.S. Dist. LEXIS 79644, *6 (N.D. Ga. June 19, 2015) (citing 29 C.F.R. § 541.302(a)).

[140] P's SMF, ¶ 92.

[141] P's SMF, ¶ 94.

[142] P's SMF, ¶ 101.

[143] P's SMF, ¶ 72.

[144] P's SMF, ¶ 70.

Here, as in the recent case of *Henderson v. 1400 Northside Drive, Inc.*, "creativity is not a requirement, and [Plaintiff's] job may be performed by anybody with general ability and training."[145] And just as in *Harrell v. Diamond A Entertainment, Inc*, a case nearly identical to *Henderson*, Defendants have "presented no criteria or standards for Plaintiff's 'try out' or her performance."[146] While Plaintiff had previously worked as a dancer, such experience was decidedly *not* a requirement for Plaintiff's dancer job. While there is no record evidence that Plaintiff has any special skill as a dancer, that fact is ultimately beside the point: Plaintiff's dancer job did not *require* "invention, imagination, originality or talent"—anybody could do it, as long as they paid the fees and were sufficiently attractive—and Defendants cannot meet their burden of proving the exemption as a matter of law.

### G. Defendants violated the FLSA's minimum wage provisions

#### 1. *Failure to pay wages*

As an employee, Dean was entitled to minimum wages of $7.25 per hour for all hours worked.[147] It is undisputed that Defendants paid Dean no wages whatsoever

---

[145] *Id.* at *7.

[146] *Harrell v. Diamond A Entertainment*, 992 F. Supp. 1343 (M.D. Fla. 1997).

[147] 29 U.S.C. § 206(a).

for her work at the Club.[148] Because Defendants have violated the FLSA's minimum wage provisions, Dean is entitled to her unpaid minimum wages, liquidated damages in an additional equal amount, her reasonable attorney's fees, and the costs of the action.[149]

### 2.  *Illegal kickbacks*

The regulations governing the interpretation of the FLSA state that " 'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.' The wage requirements of the FLSA will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee."[150]

As the Northern District of Texas held in *Reich v. Priba Corp.*, where a nightclub employs dancers and pays them no wages, a "practice of collecting a tip out fee similarly violates the FLSA because the deduction further reduces the entertainers' wages below  the minimum wage."[151] Thus, "[t]o fully compensate [Plaintiff] in the amounts required by the FLSA, [Defendants] must pay [her] the

---

[148] ¶ P's SMF, ¶ 48.
[149] 29 USCS § 216(b).
[150] 29 C.F.R. § 531.35.
[151] 890 F. Supp. 586, 595 (N.D. Tex. 1995) (citing *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 330 (5th Cir. 1993).

full minimum wage for all time worked . . . . In addition, [Defendants] must return all [] fees collected . . . ."[152] Other district courts have reached the same conclusion.[153]

Additionally, other types deductions reducing an employee's pay below the minimum wage will also violate the FLSA. For example, employers may deduct a percentage that it is charged by credit card companies for processing employee tips, but only that amount.[154] However, the burden is on the employer to demonstrate that costs levied for credit card processing charges are reasonable.[155]

In this case, just as in *Priba*, Defendants imposed credit card processing fees on Dean for redemption of her VIP dancer fees paid by credit card, but have "presented no documentation or records to support [their] contention that a percentage of the withholding covered the reasonable costs of credit card processing."[156] In fact, Popovitch has admitted that the 10% fee was an arbitrary

---

[152] *Id.*

[153] *See, e.g., Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 477 (S.D.N.Y. 2014).

[154] *See, e.g., Myers v. Copper Cellar Corp.*, 192 F.3d 546 (6th Cir. 1999); *see also* Schneider and Stine, 1 WAGE AND HOUR LAW § 8:30 (2013).

[155] *Reich v. Priba Corp.*, 890 F. Supp. at 596 (citing *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 474 (11th Cir. 1982).

[156] *Id.*

amount.[157] Defendants can provide no information regarding their merchant service provider contract prior to December 2013.[158]

"The FLSA does not permit an employer to transfer to its employees the responsibility for the expenses of carrying on an enterprise."[159] Yet that is exactly what Defendants did by requiring Dean and other dancers to pay a tenth of their tips paid by credit card. Under these circumstances, these credit card processing fees further reduced Dean's pay below the minimum wage and constituted a violation of the FLSA as a matter of law.

## H. Defendants are Not Entitled to Any Setoff of Their Minimum Wage Obligations

"Service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the FLSA."[160] Such services charges may be used to satisfy an employer's FLSA wage obligations.[161] However, "the employer's treatment of the monies received by employees may be dispositive of its classification as 'tips' or 'wages.' "[162] Thus, in *Priba*, the nightclub employer

---

[157] P's SMF, ¶ 61.
[158] P's SMF, ¶ 62.
[159] *Id.*
[160] *Reich*, 890 F. Supp. at 594 (quoting 29 C.F.R. § 531.55(b)).
[161] WH Opn Ltr No. 310 (Feb. 18, 1975); WH Opn Ltr No. 734 (Jan. 17, 1968); *see also* Schneider and Stine, 1 WAGE AND HOUR LAW § 8:28 (2013).
[162] Schneider and Stine, 1 WAGE AND HOUR LAW § 8:28 (2013).

was not permitted to use fees paid to dancers to satisfy its minimum wage obligations where the club had had not done any accounting of fees paid to the dancers and thus did not take those fees into its gross receipts.[163]

Recently, this Court reached the very same conclusion with respect to the very entity that formerly owned and operated the Club; in *Henderson v. 1400 Northside Drive, Inc.*, Judge Thrash held that because Swinging Richards had not recorded the purported service charges in its gross receipts and distributed those amounts to the dancers, it was ineligible to use those amounts to offset its minimum wage obligations.[164]

Here, just as in *Henderson*, the Club did not keep records of amounts paid in cash to dancers for stage dances, table dances, or VIP dances.[165] The Club did keep records of credit card payments made to dancers for VIP room performances, but, as in *Henderson* and *Priba*, "that a club does not treat all of the tips received as gross receipts of the company" is fatal to the club's argument that the payments are 'service charges.' "[166] "[I]t would make little sense to classify otherwise similar payments differently simply because they occurred through different mediums."[167]

---

[163] 890 F. Supp. at 594-595.
[164] 2015 U.S. Dist. LEXIS 79644, *9-12 (N.D. Ga. June 19, 2015).
[165] P's SMF, ¶¶ 54, 55.
[166] *Id.* (quoting *Priba Corp.*, 890 F. Supp. at 594–95).
[167] *Id.*

Additionally, as the *Henderson* court noted, where cash payments are distributed directly to the dancers, the employer does not "distribute" the monies, and those monies may not be classified as service charges. Thus, as in *Henderson* and *Priba Corp.*, Dean is entitled to summary judgment on Defendants' affirmative defense of offset.

## I.     Defendants' violations of the FLSA were "willful" and were not made in "good faith"

An award of liquidated damages to a prevailing FLSA plaintiff is mandatory unless "the employer shows . . . that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA."[168] Section 16(b)'s use of the term "liquidated damages" is considered "something of a misnomer,"[169] because they "are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA,"[170] Per the plain language of the statute, the determination of good

---

[168] *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1270 (11th Cir. 2008); *see also Spires v. Ben Hill Cnty.*, 980 F.2d 683, 689 (11th Cir. 1993) (Liquidated damages are mandatory absent a showing of good faith.).
[169] *Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 71 n.4 (2d Cir. 1997).
[170] *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999) (citing *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583-84, 62 S. Ct. 1216 (1942)).

faith is for the "court" and not the "jury." The decision is discretionary, but "the

discretion of the court to decline an award of liquidated damages under 29 U.S.C.

§ 260 is invoked only if the employer carries its burden of showing both that it

acted in good faith and that it had reasonable grounds for believing that it had not

violated the FLSA."[171]

Additionally, while the FLSA's statute of limitations is normally 2 years, it

extends to 3 years where the plaintiff is able to establish that a defendant "knew, or

showed reckless disregard for, the fact that its conduct was forbidden by the

FLSA."[172] The concept of "good faith" and "willfulness" use different terms but

are, substantially the same issue.

In the present case, the questions of willfulness and good faith should be

determined for two separate time periods: prior to December 2013 when the Club

was owned and operated by Defendant Jones, and from December 2013 through

August 2014, when Defendant Popovitch owned and operated it.

For the earlier period, the question of willfulness could not be simpler to

answer: Jones and 1715 were put on notice 20 years earlier—by none other than

the Wage & Hour of the Department of Labor—that they were misclassifying their

---

[171] *Sinclair v Automobile Club of Oklahoma, Inc.,* 733 F.2d 726 (10th Cir. 1992).
[172] *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.,* 515 F.3d 1150, 1162–1163 (11th Cir. 2008).

dancers as independent contractors.[173] Additionally, 1715 has not shown any attempt to comply with the FLSA prior to December 2013. For this first time period, a finding of willfulness is inevitable and Dean is entitled to summary judgment.

As to the period beginning in December 2013, it appears that Popovitch may not have been on notice of Wage & Hour's earlier determination. The DOL finding may not be, therefore, determinative of the issue of her showing of "good faith" in order to avoid liquidated damages. However, the facts demonstrate that 1715, A-1, and Popovitch continued to operate the Club with flagrant disregard for the FLSA's requirements. The Club's managers collected fees each shift from waitresses and bartenders, who were tipped employees.[174] The Club never sought any opinion or advice as to its wage obligations to dancers. Instead, Popovitch claims she merely read DOJ fact sheets and independently made the determination that Plaintiff and other dancers were independent contractors and should not be paid at all.[175] Even accepting this self-serving claim at face value, Popovitch's independent interpretation of the FLSA is insufficient to show good faith, and there is the undisputed evidence shows that the Club's violations were willful.

---

[173] P's SMF, ¶ 106–109.
[174] P's SMF, ¶ 71.
[175] P's SMF, ¶ 105.

**J.      Plaintiff is Entitled to Summary Judgment as to All of the Counterclaims of Defendants 1715, A-1, and Popovitch**

Defendants 1715, A-1, and Popovitch have raised counterclaims against Dean for breach of contract, unjust enrichment, and promissory estoppel.[176] All three fail as a matter of law and should be dismissed.

### 1.      Standing

As a preliminary matter, Popovitch has no standing to assert any of the three counterclaims. In fact, she claims not only that she is not an "employer" under the FLSA, but also that she has no personal knowledge of the agreement between the Club and Dean.[177] There is no evidence in the record that Popovitch had any agreement with Dean and thus she lacks standing to bring any of the three counterclaims asserted.

### 2.      Breach of Contract

Defendants' breach of contract claim is premised on the theory that Plaintiff agreed to be an independent contractor and that, "[b]y demanding compensation inconsistent with the independent contractor agreement, Plaintiff has breached and repudiated the contract."[178]

---

[176] Dkt. 21, pp. 13–17. ¶
[177] P's SMF, ¶ 38.
[178] Dkt. 21, pg. 16.

This claim must fail because it seeks damages arising from an agreement that purported to nullify the purposes of the FLSA. Neither an employee nor an employer can effectively waive or contractually abridge any of the provisions of the Fair Labor Standards Act.[179] Thus, despite Defendants' argument that Dean entered into an agreement whereby she would work as an independent contractor, this Court cannot enforce such a contract.

### 3. Unjust Enrichment

Defendants' counterclaim for unjust enrichment alleges that "Plaintiff was unjustly enriched by collecting and retaining the club's services fees."[180] This argument has no merit.

Unjust enrichment exists when there is invalid contract, but where one party has conferred a benefit to another that would result in the second party's unjust enrichment unless it compensates the first.[181]

Here, the record unambiguously shows that Dean retained *tips* given to her by Defendants' customers and with Defendants' knowledge. Those gratuities were never taken into the Club's gross receipts or distributed to Dean by Defendants. Defendants never conferred any benefit on Plaintiff for which they have not been

---

[179] *Lee v. Flightsafety Servs. Corp.*, 20 F.3d 428, 432 (11th Cir. 1994).
[180] Dkt. 21, pg. 16.
[181] *Cochran v. Ogletree*, 244 Ga. App. 537, 539 (1), 536 SE2d 194 (2000).

compensated. That Dean can keep her tips and still demand to be paid wages by

Defendants may not seem *fair* to Defendants, but that does not create a cause of

action.

### 4. Promissory Estoppel

Defendants' third counterclaim of promissory estoppel has no more merit than

the other two. Defendants allege that

> Plaintiff promised Defendants that the independent contractor
> arrangement was satisfactory to Plaintiff. In reasonable reliance
> on this promise, Defendants allowed Plaintiff to apply her trade
> in the club and collect service fees and tips. Plaintiff breached
> her promise by generating the current action.[182]

Georgia has codified the equitable principle of promissory estoppel:

> A promise which the promisor should reasonably expect to
> induce action or forbearance on the part of the promisee or a
> third person and which does induce such action or forbearance
> is binding if injustice can be avoided only by enforcement of
> the promise. The remedy granted for breach may be limited as
> justice requires.[183]

Judge Story considered and rejected a similar argument in an adult

entertainment FLSA case. In *Clincy*, the defendant nightclub argued that "because

Plaintiffs were given the choice of being treated as an employee or independent

---

[182] Dkt. 21, pg. 17.

[183] O.C.G.A. § 13-3-44(a); *see also Pethel v. Waters*, 220 Ga. 543, 552(4), 140
S.E.2d 252 (1965).

contractor, and elected to be treated as an independent contractor . . . the economic reality is that they are independent contractors." The court quickly dispensed with this argument, citing a number of cases showing that agreeing to be labeled as an independent contractor is, in and of itself, meaningless.[184]

But Defendants' argument also fails for reasons other than those particular to the FLSA; under the law of promissory estoppel, Defendants were not justified in relying on any representation made by Dean as to her independent contractor status:

> "[B]ecause promissory estoppel is an equitable doctrine, the third requirement is one of *reasonable reliance*," which requires that "the [complaining party] *relied exclusively on such promise* and *not on his or her own preconceived intent or knowledge*; that [he] exercised *due diligence*, so as to justify such reliance as a matter of equity; and that there was nothing under the circumstances which would prevent [him] from relying to his detriment."[185]

---

[184] *Clincy*, 808 F. Supp. 2d at 1349 (citing *Donovan v. Tehco*, Inc., 642 F.2d 141, 143 (5th Cir. 1981) ("In deciding whether an individual is an 'employee' within the meaning of the FLSA, the label attached to the relationship is dispositive only to the degree it mirrors the economic reality of the relationship."); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301, 302 105 S. Ct. 1953 (1985) ("the purposes of the Act require that it be applied even to those who would decline its protections")).

[185] *First Bank v. Robertson Grading, Inc*., 328 Ga. App. 236, 242, 761 S.E.2d 628, 634–635 (2014) (emphasis added).

Given the facts of this case, Defendants' argument must fail. Defendants had the policy of treating dancers as independent contractors, not Plaintiff. The record does not show—and Defendants do not allege—that Plaintiff made any representations at all other than agreeing to work pursuant to Defendants' terms. And even if Plaintiff had actively tried to convince Defendants that she was an independent contractor, an employer is not justified in relying on such a characterization when it is at odds with the FLSA. Thus, the undisputed facts of this case cannot support a claim for promissory estoppel as a matter of law.

## III.   CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court enter summary judgment in her favor as to each issue enumerated above. Plaintiff further requests that the Court set this case for trial as to the remaining issues.

Dated: November 4, 2015.

Respectfully submitted,

**DELONG, CALDWELL, BRIDGERS, FITZPATRICK & BENJAMIN, LLC**

3100 Centennial Tower            */s/Kevin D. Fitzpatrick, Jr.*
101 Marietta Street              Kevin D. Fitzpatrick, Jr.
Atlanta, GA 30303                Georgia Bar No. 262375
(404) 979-3150
(404) 979-3170 (facsimile)

charlesbridgers@dcbflegal.com
michaelcaldwell@dcbflegal.com
matthew.herrington@dcbflegal.com

*/s/Charles R. Bridgers*
Charles R. Bridgers
Georgia Bar No. 080791

*/s/Matthew W. Herrington*
Matthew W. Herrington
Georgia Bar No. 275411

Counsel for Plaintiff